Jack M. Bass & Company et al. [1] v. Commissioner. Jack M. Bass & Co. v. Commissioner
Docket Nos. 54648-54651.
United States Tax Court
T.C. Memo 1957-208; 1957 Tax Ct. Memo LEXIS 44; 16 T.C.M. (CCH) 941; T.C.M. (RIA) 57208; October 31, 1957
*44 William Waller, Esq., American Trust Building, Nashville, Tenn., for the petitioners. Homer F. Benson, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: In these consolidated proceedings respondent determined the following income tax deficiencies: Petitioner
1944
1945
1946
1947
1948
Jack M. Bass & Company
$5,681.54
$15,078.45
$10,001.83
$2,765.57
$ 561.40
Jack M. Bass
842.05
436.32
Mary McKinney Bass
35,299.49
57,229.92
521.95
Jack M. Bass, Sr. and Mary
McKinney
Bass
4,520.10 Respondent also determined deficiencies of $140.76 and $4,469.59 in the excess profits tax of petitioner, Jack M. Bass & Company, for the years 1944 and 1945, respectively. Petitioners concede some of respondent's adjustments, leaving only the following to be decided: Whether respondent correctly determined that certain dividends, interest and gains and losses from sales of stocks and bonds were corporate income and losses of Jack M. Bass & Company, rather than income and losses of Jack M. Bass, Mary McKinney Bass and their son, personally; and, if so, whether withdrawals, charged on the company's *45 books to the accounts of Jack M. Bass, Mary McKinney Bass and their son, were dividends and, as such, taxable to Mary McKinney Bass who owned all but a few qualifying shares of the company. Findings of Fact Jack M. Bass & Company, henceforth called the company, was incorporated in Tennessee on January 20, 1931. It engaged in the securities business from 1944 through 1948, having its principal office in Davidson County, Tennessee. The company's president, Jack M. Bass, henceforth called Jack, organized the company, managed it and handled all of its business operations but he was never a stockholder. Jack's wife, Mary McKinney Bass, henceforth called Mary, owned all but 2 of the company's 2,340 shares of common stock from the date of its organization through 1948, but was neither an officer nor a director. Jack, Mary and the company filed their returns for the years in issue with the collector of internal revenue for the district of Tennessee. The company was organized to engage in the stock brokerage business. It bought unlisted securities for resale to customers. It also bought both unlisted and listed securities to hold for a profit. As an accommodation to its customers it *46 bought and sold for them securities listed on national stock exchanges through stock exchange member firms. The company found it desirable to concentrate most of this business with one firm in New York. On the purchase and sale of listed securities for customers the company made no profit, simply charging the customer with the New York Stock Exchange commission and other out-of-pocket expenses incurred in the transaction. Sometime in 1943 Jack, as president and manager of the company, opened three individual accounts on the company's records, one of which was in his name, one in the name of Mary, and the other in the name of his minor son. From 1944 through 1948, Jack used the cash or credit, or both, of the company to purchase securities for the accounts of these three individuals. These accounts were managed completely by Jack, who purchased and sold the securities in his own discretion. When the company purchased or sold securities for Jack, Mary and their son, a ticket was made out, usually on the same day that the transaction took place, giving the details of the purchase or sale. The individual accounts were posted in the regular course of business from these tickets. On *47 the accounts of the individuals, charges were made for each purchase, and credits were entered representing the receipt of dividends, interest income and proceeds of security sales. Appropriate entries were also made in these accounts when cash withdrawals or deposits were made. The securities charged to the individual accounts were purchased in a "street name," the name of the company being used. These securities were at all times retained by the company in this name and were used by it as collateral for loans. The individual petitioners could have obtained the securities at any time by paying their debit balances to the company. The company's regular customers were not extended credit or allowed to carry accounts but were required to pay in full for the securities purchased. The company did not require any of the individuals to pay any part of the purchase price of the securities which were assigned to their respective accounts or to put up any margin in the form of cash or otherwise. The market value of the securities in the accounts of Jack and Mary exceeded the amount owed the company during 1944 through 1948. Their son occasionally owed the company more than the market value *48 of his securities. Mary, who guaranteed his account, had securities in her account with sufficient market value to exceed this deficit as well as the amount which she owed the company. From 1944 through 1948, the company had a substantial net worth but paid only one formal dividend. This dividend was declared in May 1946 and amounted to $1 per share or a total of $2,340. The company's surplus balances were: December 31, 1944
$ 87,485.07
December 31, 1945
151,749.20
December 31, 1946
444,517.36
December 31, 1947
460,673.56
December 31, 1948
485,480.25
Respondent determined that withdrawals from the following accounts constituted "informal" dividends to Mary: Account
1944
1945
1946
1947
1948
Mary
$6,733.90
$18,089.86
* $92,016.73
$4,904.31
$11,737.33
Son
2,095.75
9,721.99
4,653.14
1,012.78
784.80
Jack
39,242.67
* 992.07
100.00
6.42
Assets
1,202.57
1,295.48
Expense
936.34
579.61
827.92
Dividend on Seaboard
500.00
Airline
Total
$8,829.65
$67,054.52
$99,800.85
$6,596.70
$15,151.95
Jack and Mary gave no significance, in reporting their income, to the dates on *49 which amounts were withdrawn from their accounts. They reported all profits and losses in the years the securities were sold and all dividend and interest income in the years received for their respective accounts by the company, and credited to them. Respondent, in his deficiency notice to the company, attributed to the company all the income and losses reported by Jack, Mary and their son in 1944 through 1948, eliminating these amounts from the returns of the individuals. Respondent included in Mary's income all withdrawals made by her, Jack and her son from their respective accounts during 1944 through 1948, treating these withdrawals as informal or disguised dividends to Mary. Jack withdrew $25,000 from his account in 1945 and gave it to Mary who loaned it to the company. This loan was repaid to Mary in 1947 and was deposited in her individual bank account. The income and losses credited and charged by the company to the individual accounts were not income and losses of the company. The withdrawals by Jack, Mary and their son were not dividends of the company to Mary. Opinion Only by assuming that what was done here was essentially a sham and that the apparent transactions *50 were in contravention of what really happened can respondent's determination be sustained. See, e.g., , reversed on this point (C.A. 5) . The corporate-petitioner apparently bought securities as agent for its sole stockholder and members of her family. While the purchase price was advanced by the corporation, it was immediately charged to the individual accounts and the securities were then held as collateral by the corporation but carried as the individuals' property. When the securities were sold, the profit was credited or the loss charged to the individual account and, in the meantime, any dividends were similarly treated. In spite of this, respondent insists that the purchases and sales and the resulting net profits belonged to the corporation; and when, as was to be expected, the proceeds were distributed, he says they were disguised dividends to the corporation's sole stockholder, the latter being argued notwithstanding that the individuals who were not stockholders also received some of the payments. It is, of course, axiomatic that the burden of proof ordinarily lies upon petitioner. But it seems *51 to us when, as in the present instance, the full detail of a transaction is disclosed and there is nothing to indicate a lack of good faith or deception, or that the events did not take place as the records indicate, the burden of going forward with the evidence to show the contrary must be shifted to respondent's shoulders. Cf. . Here we find the showing insufficient to carry that burden. That the securities were held in street names is so common a practice when securities are bought by a brokerage firm and held as collateral for a debit balance that it furnishes no indication of anything unusual. And the same may be said as to services rendered for these individuals, without charge, which the corporation apparently did not as a business practice arrange for others. The corporation was closely held, the individuals were members of the controlling stockholder's family, and it is natural enough that such requirements as a fee for services or immediate cash payment which might be exacted of strangers would not be necessary here. On the whole record, we are unable to discern any basis to warrant disregarding the reality of what occurred. The *52 determination is disapproved. Decision will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Jack M. Bass, Docket No. 54649; Mary McKinney Bass, Docket No. 54650; Jack M. Bass, Sr., and Mary McKinney Bass, (Husband and Wife), Docket No. 54651.↩
*. Net.↩